HEALTH CARE SERVICE CORPORATION, An Unincorporated Division of Which is Blue Cross and Blue Shield of Texas, Appellant

v.

EAST TEXAS MEDICAL CENTER, Appellee

NO. 12–15–00287–CV

Court of Appeals of Texas, Tyler.

Opinion delivered April 29, 2016

Rehearing and Rehearing En Banc Overruled May 20, 2016

Gregory D. Smith for Appellant.

Deborah J. Race for Appellee.

Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.

### OPINION ON REHEARING

JAMES T. WORTHEN, Chief Justice

Blue Cross and Blue Shield of Texas, a Division of Health Care Service Corporation (BCBS), seeks to dissolve a temporary injunction requiring it to place East Texas Medical Center (ETMC) in its preferred

provider network (PPO). After this court issued its opinion in this case, ETMC filed a motion for rehearing. We withdraw the opinion and judgment dated February 29, 2016, and issue this opinion and judgment in its stead. The motion for rehearing is overruled. We dissolve the temporary injunction and remand this case to the trial court for further proceedings.

## BACKGROUND

ETMC is the only not for profit, full service, acute care hospital in the State of Texas that is not in BCBS's PPO network. ETMC has annually sought to become a member of BCBS's PPO network since 1993, but has been continually rebuffed by BCBS. On June 2, 2015, ETMC filed suit against BCBS seeking damages for breach of its duties to ETMC and for interference with prospective business relations and economic advantage.[1] The trial court set the case for trial in November 2016.

On July 30 and September 24, 2015, respectively, Moody's Investor Services and Fitch Ratings downgraded ETMC's bond ratings. Both Moody's and Fitch stated ETMC's "outlook remains negative." Both rating agencies described declining revenues and patient volumes as the reason for their downgrades. Specifically, Moody's stated that these declines were "amplified by ETMC's longstanding out-of-network status with all major commercial insurance companies."

Following these two bond downgrades, ETMC filed an amended petition seeking a temporary injunction requiring BCBS to put ETMC in its PPO network. On November 10, the trial court held a six hour hearing on this request. ETMC's balance sheet, part of the documentary evidence admitted at the hearing, showed ETMC had $286,857,000.00 cash and cash equivalents on hand as of September 30, 2015. Further evidence showed ETMC had a $140,594,000.00 cash surplus above its bond covenant requirement.[2]

Byron Hale, chief financial officer for ETMC, testified that ETMC lost $16,000,000.00 dollars in FY 2015. He testified that ETMC would not be able to continue its current level of services unless the trial court required BCBS to put ETMC in its PPO network immediately. Dr. Steven Rydzak, chairman of ETMC's department of medicine and a member of its board of directors, testified that "it's inevitable that ETMC Tyler will fail unless relief is imminent." Immediately upon conclusion of the hearing, the trial court rendered an order granting the temporary injunction, which in pertinent part states as follows:

> ...Without immediate access to privately-insured patients under the Blue Cross PPOs, ETMC will be unable to maintain its current level of comprehensive medical care services to the community before a trial on the merits. Thus, without injunctive relief, ETMC will be unable to fulfill its mission of continuously striving to bring an unmatched spirit of excellence to the art and science of healthcare, the success of which is measured by ETMC's impact on the quality of life for the people and communities in East Texas. ETMC's closure, or significant reduction in the services it provides,

1. In the same suit, ETMC sought damages on the same legal theories from Aetna Health, Inc., Aetna Life Insurance Company, Cigna Healthcare of Texas, Inc., and Cigna Health and Life Insurance Company. None of these companies are included in the trial court's temporary injunction.

2. Both Moody's and Fitch described ETMC as having a "conservative" debt profile. Moody's July 30 report stated that ETMC had $43,000,000.00 in operating cash, which was being reduced by $1,000,000.00 a month.

would result in irreparable injury and extreme hardship to East Texas patients who would have fewer health care options and no access to the services which only ETMC provides in the area. Accordingly, the evidence demonstrates and the Court finds that this temporary injunction is necessary to prevent irreparable harm and extreme hardship to ETMC and members of the public.

. . . .

ACCORDINGLY, IT IS ORDERED that the application is GRANTED. Blue Cross and its agents, employees, independent contractors, attorneys, representatives and persons or entities in active concert or participation with Blue Cross who receive actual notice of this order by personal service or otherwise, are ordered to desist and refrain from breaching Blue Cross' duties to ETMC by taking the following actions until the Court enters a final judgment in this case:

1. Cease and desist from excluding ETMC from the Blue Cross PPOs by allowing ETMC's immediate and full participation in Blue Cross's Blue Options and Blue Choice PPO networks at rates identical to those in force in the Hospital Agreement for Traditional Indemnity Business in effect between ETMC and Blue Cross (effective August 15, 2012, as amended effective September 15, 2015), attached as Exhibit A to this Order, until new PPO agreements are negotiated and signed;

2. Cease and desist from excluding ETMC from its electronic preferred provider directories by listing ETMC as an in-network provider; and

3. Cease and desist from restricting ETMC's right and ability to mar-

ket itself as an in-network preferred provider in Blue Cross's Blue Options and Blue Choice PPO networks.

BCBS timely filed an accelerated appeal of the temporary injunction to this court.

## ISSUE PRESENTED

BCBS argues in one issue that ETMC failed to produce probative evidence establishing a probable, imminent, and irreparable injury before the scheduled trial on the merits in November 2016. Therefore, BCBS argues that the trial court abused its discretion when it impermissibly altered the status quo between the parties by granting the temporary injunction.

## TEMPORARY INJUNCTION

To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Id.* In this context, the status quo is the last, actual, peaceable, noncontested status between the parties to the controversy that preceded the pending suit. *See In re Newton*, 146 S.W.3d 648, 651 (Tex.2004); *Cannan v. Green Oaks Apts., Ltd.*, 758 S.W.2d 753, 755 (Tex.1988).

There are two general types of temporary injunctions: prohibitive and mandatory. *RP & R, Inc. v. Territo*, 32 S.W.3d 396, 400 (Tex.App.–Houston [14th Dist.] 2000, no pet.). A prohibitive injunction forbids conduct, and a mandatory injunction requires it. *Lifeguard Benefit Servs. v. Direct Med. Network Sols., Inc.*,

308 S.W.3d 102, 112 (Tex.App.–Fort Worth 2010, no pet.). A preliminary mandatory injunction is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship. *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex.1981).

### Standard of Review

▮▮▮ The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993). A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion. *Butnaru*, 84 S.W.3d at 204. The trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision. *Id.* More specifically, the trial court does not abuse its discretion when it bases its decision on conflicting evidence, or when some evidence of substantive and probative character exists to support its decision. *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 292 (Tex.App.–Beaumont 2004, no pet.); *Grubaugh v. Tex. Emp'rs Ins. Ass'n*, 677 S.W.2d 812, 814 (Tex.App.–Fort Worth 1984, writ dism'd). An abuse of discretion arises when the trial court misapplies the law to the established facts of the case or when it concludes that the movant has demonstrated a probable injury or a probable right to recovery, and the conclusion is not reasonably supported by the evidence. *Tri–Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 587 (Tex.App.–El Paso 2003, pet. denied).

### Opinion Testimony

▮▮▮ The Texas Rules of Evidence permit opinion testimony from lay witnesses as well as expert witnesses. *See* TEX. R. EVID. 701, 702. The personal experience and knowledge of a lay witness may establish that the witness is capable, without qualification as an expert, of expressing an opinion on a subject outside the realm of common knowledge. *Hathcock v. Hankook Tire Am. Corp.*, 330 S.W.3d 733, 747 (Tex.App.–Texarkana 2010, no pet.). It is only where the fact finder may not fully understand the evidence or be able to determine the fact in issue without the assistance of someone with specialized knowledge that a witness must be qualified as an expert. *Id.*

Texas courts regularly allow business owners and company officers to testify as lay witnesses, based on knowledge derived from their positions and any other relevant experience. *See, e.g., Am. Heritage, Inc. v. Nev. Gold & Casino, Inc.*, 259 S.W.3d 816, 827 (Tex.App.– Houston [1st Dist.] 2008, no pet.) (former chief financial officer testified about lost profits); *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 797 (Tex.App.–Dallas 2007, no pet.) (business owner testified about value of services he provided to retail chain); *SAS & Assoc., Inc. v. Home Mktg. Servicing, Inc.*, 168 S.W.3d 296, 302 (Tex.App.–Dallas 2005, pet. denied) (sole shareholder, director, and officer testified about reasonable cost of repairing company's damaged personal property).

▮▮▮ In this case, testimony was provided by Byron Hale, ETMC's chief financial officer, and Dr. Steven Rydzak, chairman of ETMC's department of medicine and a member of its board of directors. At the temporary injunction hearing, ETMC did not qualify either witness as an expert. Hale's and Dr. Rydzak's testimony concerned their knowledge of ETMC's operations and financial condition rather than their specialized knowledge, skill, experience, training, or education. Therefore, we conclude that both witnesses testified as lay witnesses.[3] *See Reid Road*

---

3. The Texas Supreme Court has acknowledged that "[t]he line between who is a Rule

*Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 850 (Tex.2011) (witness testifying as expert when testimony is, in substance, based on special knowledge, skill, experience, training, or education in a particular subject). Accordingly, their opinion testimony was limited to those opinions or inferences that were rationally based on their perceptions and were helpful to clearly understanding their testimony or determining a fact in issue. *See* Tex. R. Evid. 701.

 "Rationally based" means that the opinion must be one that a person could normally form from observed facts. *Ethicon, Inc. v. Martinez*, 835 S.W.2d 826, 831 (Tex.App.–Austin 1992, writ denied). When an opinion is not rationally based on a witness's perception, the purported evidence is only speculation. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 465 (Tex.1992). Speculative testimony has no probative value. *See Coastal Transport Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex.2004); *see also Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex.2012) (applying Coastal to lay witness testimony). "Speculate" means "to take to be true on the basis of insufficient evidence." *Bd. of Trustees of Fire & Police Retiree Health Fund v. Towers, Perrin, Forster & Crosby, Inc.*, 191 S.W.3d 185, 194 (Tex.App.–San Antonio 2005, pet. denied).

### Analysis

 Between the years of 1993 and 2015, there was no contract allowing ETMC to be a part of BCBS's PPO network. That was the status quo. When the trial court entered a temporary mandatory injunction requiring BCBS to put ETMC in its PPO network, it altered the status quo. The issuing of a temporary

702 expert witness and who is a Rule 701 witness is not always bright." *Reid Road*

mandatory injunction altering the status quo is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship. *Tri–Star Petroleum Co.*, 101 S.W.3d at 592. When asked at oral argument what evidence it had produced at the temporary injunction hearing to support the granting of the temporary injunction, ETMC pointed to the following opinion testimony offered by Hale and Dr. Rydzak:

#### Byron Hale

Q Mr. Hale, based on your knowledge of the financial condition of this—of East Texas Medical Center, tell us what you believe the effect of being out of network is going to be on the mission and the services provided at this hospital if we are not allowed—if Judge Skeen does not allow us—does not require Blue Cross Blue Shield to put us in the PPO network?

A Your Honor, we will not be able to meet our mission, and we will not be able to continue the services that we currently offer.

Q What services do you place at the most risk?

A Well, we're losing this year about $16 million. The changes and reductions are going to have—be significant and dramatic. So we're looking at changing our complement of services in a dramatic way. And to get the kind of impact that we need to reduce a loss of that magnitude, we're talking about comprehensive reduction in services. And that includes big programs that are important to the community that are costly, but yet we're paid less than the cost to provide that service, such as Level 1 trauma.

*Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 851 (Tex.2011).

You know, we're the trauma center for all of East Texas. That's a wonderful program, but it's very costly to maintain. And, you know, it's a—it's one that we would consider and be forced to eliminate.

As—Your Honor, as you know, we're the largest mental health provider in this area, a very challenging program to operate. It costs us more to operate that program than we collect in revenues. That's a program that would be subject to closure.

And I mentioned earlier, we've tightened the belt as much as we could this year. We've exited seven counties in our ground ambulance service this past year. We'd have to revisit that, look at some further reductions in ground ambulance.

We operate three air ambulances at a loss. Those are a candidate to be reduced; ground those air ambulances right away.

The renal transplant program, another wonderful program we've done for 30 years at East Texas Medical Center, it costs more to do that service than we're paid. That's the kind of service reductions we're going to be forced to make to remedy the loss that we have.

Q All right. In order to—if you don't—if we don't get the relief we're seeking today, are those the effects you believe that are reasonable to be had on the mission of East Texas Medical Center?

A We have no choice. We'll have to do that.

. . . .

Q And will that allow you to stay in business—keep the same level of services until November 2016 when we get to trial in this case?

A Yes. I believe that relief will allow us to maintain all those services that otherwise we would have to cut and curtail.

*Dr. Steven Rydzak*

Q And as a board member and as a doctor, can you sum up to Judge Skeen what we're asking him to do?

A Your Honor, we're asking for immediate relief. As a board member, I can tell you that we have a great deal of anxiety about the future of this hospital and subsequently the system. We don't believe the system will continue to function without ETMC Tyler, and we feel that it's inevitable that ETMC Tyler will fail unless relief is imminent.

We—we see the writing on the wall. We acknowledge it. We've gone to Blue Cross and Blue Shield. We've asked to be let in [the] network and basically have gotten no response.

We—we know that it's very difficult to maintain the high standards that we've been able to maintain for many, many years and to have the kind of expertise that we have. The gentlemen that testified before you today, those guys are really hard to come by. It's very difficult to draw them to a small town like East Texas and have them work here, and particularly the remarkable programs they do.

Once these programs are lost, it will be many, many years before anything can even remotely take the place of that. When—and on the board we've had discussions about eliminating Level 1 trauma. And the problem is in order for us to really save money, we wouldn't even be able to go down to Level 2, we'd have to continue to go down to Level 3 or Level 4 trauma to really save enough money to make a difference for the hospital.

So we're talking about enormous changes to the health care environment

in East Texas, and so we're asking for some relief so that we can continue to do our good work and fulfill our mission until this case can go to an East Texas jury next November.

ETMC was required to show that it would suffer a probable, imminent, and irreparable injury prior to November 2016 by either having to close the hospital or cut services. But neither Hale nor Dr. Rydzak specifically opined that ETMC would close or cut services before November 2016. Thus, ETMC's proof of probable, imminent, and irreparable injury is lacking. But even if we assume that Hale's and Dr. Rydzak's testimony expresses an opinion that one of those events will occur prior to November 2016, their opinions would not be probative evidence because they are speculative. *See Justiss,* 397 S.W.3d at 156–57.

Hale's testimony was that ETMC had lost $16,000,000.00 in FY 2015–an average of $1,333,000.00 per month. Certainly, this is a trend that ETMC cannot continue indefinitely. In other testimony, Hale related that ETMC's bond ratings had been downgraded and its debt coverage ratio had to be at 110% but had dropped from 2.2 in 2013 to 1.8 in 2014. He also testified that ETMC had done everything possible to reduce the cost of its operation to offset the reduced revenue, which included reducing some services the previous year. However, ETMC's own financial data shows that it had a cash cushion of $140,594,000.00 above its bond covenant requirement, as of September 30, 2015.

We cannot say that, based on these facts, a person would normally conclude that ETMC will have to close or cut services before the November 2016 trial date. Therefore, any such opinion would be speculative because it is not rationally based on the witnesses' perceptions. Consequently, the opinion has no probative value.

ETMC has not presented any probative evidence of probable, imminent, and irreparable injury prior to November 2016. Accordingly, we hold that the trial court abused its discretion in issuing the temporary injunction. BCBS's sole issue is sustained.

### DISPOSITION

Having held that ETMC failed to produce evidence of a probable, imminent, and irreparable injury before November 2016, we need not address the first two elements necessary to obtain a temporary injunction. *See RP & R, Inc.,* 32 S.W.3d at 401. The temporary injunction of November 10, 2015 is immediately *dissolved,* and the case is *remanded* to the trial court for further proceedings.

